## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DENNIS TOLLIVER,

        Applicant,

v.                                      CV 07-0918 JH/WPL

MICHAEL HEREDIA, WARDEN,
AND THE ATTORNEY GENERAL
OF NEW MEXICO,

        Respondents.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Dennis Tolliver is serving a fifteen-year sentence for possession of drug paraphernalia, possession of methamphetamine, distribution of methamphetamine, trafficking methamphetamine, and conspiracies to distribute and traffic methamphetamine. (Doc. 9 Ex. B.) He has filed an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody. (Doc. 1.) For the reasons that follow, I recommend that the Application be denied.

#### FACTUAL AND PROCEDURAL BACKGROUND

Tolliver's convictions arose from three separate incidents. On the evenings of December 10, 2003, and December 16, 2003, he assisted Jason Kimble in "cooking" and transferring methamphetamine to Martin Beals, a confidential informant. (Doc. 9 Ex. I at 3-4.) On March 31, 2004, law enforcement officers found methamphetamine and drug paraphernalia in the truck Tolliver was driving when they executed a warrant for his arrest. (*Id.* at 5-6.)

Beals was equipped with a digital recording device during the entire transaction that occurred on December 10, 2003 and during part of the evening of December 16, 2003. The recordings were

played for the jury.  (Trial Tapes 3-5 June 28, 2005.)  Although they were difficult to understand, Beals interpreted them for the jury—describing the process of cooking the methamphetamine and identifying comments made by Tolliver.  (*Id.*)  Two law enforcement officers testified that while under arrest on March 31, 2004, Tolliver acknowledged that the methamphetamine in the truck was his. (Trial Tape 5 June 27, 2005; Trial Tape 1 June 28, 2005.)  He also admitted to the officers that he had cooked methamphetamine twice with Kimble and sold it once to Beals.  (Trial Tape 5 June 27, 2005; Trial Tape 1 June 28, 2005.)  The defense did not present any evidence.

Tolliver filed both a direct appeal and a state habeas petition.  (Doc. 9 Ex. I, S.)  As Respondents concede, Tolliver exhausted all of his federal habeas claims by raising them in either his direct appeal or his state habeas petition and pursuing both the direct appeal and the state habeas petition to the state supreme court.  (*See id.* at 5.)  The appellate court rejected one of the federal habeas claims in a memorandum opinion, and the state habeas court summarily dismissed all of the claims without stating any reasons.  (*Id.* Ex. O, T.)

## STANDARD OF REVIEW

This Court may not grant a writ of habeas corpus on an issue decided on the merits by a state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).  For purposes of 28 U.S.C. § 2254, "clearly established Federal law" includes only Supreme Court precedent interpreting the Constitution.  *Smith v. Dinwiddie*, 510 F.3d 1180, 1186 (10th Cir. 2007); *see also Carey v. Musladin*, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'").  The writ may also issue if the state court's decision was based on an unreasonable determination of the facts in light of the evidence

presented.  28 U.S.C. § 2254(d)(2).  When reviewing a summary disposition by a state court, the focus is on the state court's result, rather than the lack of reasoning.  *Stevens v. Ortiz*, 465 F.3d 1229, 1235 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1833 (2007).

To show that a decision is "contrary to" clearly established federal law, an applicant must demonstrate that the state court applied a rule that contradicts the governing law set forth in Supreme Court cases or that it arrived at a different result than the Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1819 (2007).

To show that a decision involved an unreasonable application of clearly established federal law, an applicant must show that "most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law.  It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision."  *Maynard*, 468 F.3d at 671.  Instead, "the state court decision must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'"  *Id.* (quoting *Badelle v. Correll*, 452 F.3d 648, 655 (7th Cir. 2006)).  In other words, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254."  *Id.*

## JUROR MISCONDUCT

Tolliver's trial counsel filed a motion for new trial, stating that she "received a forwarded e-mail which stated that a one [sic] juror disclosed to court personnel that he felt 'forced' into the guilty verdict on some counts."  (Record Proper (RP) at 373.)  This allegation apparently arose from a conversation between the juror and a member of the court's staff at a liquor store.  (*Id.* at 377.)  Defense counsel asserted that she had attempted to locate the juror but had been unable to locate him.

3

She requested that the court grant a new trial or allow her additional time to supplement the motion. (*Id.* at 373-74.)  In her oral argument on the motion for new trial, counsel indicated that an additional juror may have felt forced into the verdict.  (Sentencing Tape 1 July 20, 2005.)  The trial court denied the motion.  (*Id.*)  The New Mexico Court of Appeals upheld the trial court's decision because the juror's alleged comment was not a matter of record and because all of the jurors indicated their concurrence in the verdicts when they were individually polled.  (Doc. 9 Ex. O at 14.)      In his state habeas petition, Tolliver provided more details about the alleged juror misconduct and included additional allegations.  He claimed there, as he does in his federal habeas application, that Jurors Baca and Petalco could not read or understand English well enough to participate in the trial.  According to Tolliver, neither man could read or understand the jury instructions.   Both of them had others assist them in completing the juror questionnaire and were told that "they would be in trouble" if they did not sign the questionnaires.  Petalco was told that he would be deported because he is an illegal immigrant.  (Doc. 1 at 6; Doc. 9 Ex. S at 2.)  Tolliver claims that the foreman of the jury knew that Petalco and Baca did not understand English and that he used this fact to coerce them into giving a guilty verdict.  Tolliver further claims that the foreman told them that a ten-to-two vote was unanimous.  (Doc. 1 Supp. at 1; Doc. 9 Ex. S at 3.)  Tolliver asserts that it is a violation of the New Mexico Constitution for jurors not to have a working knowledge of English.

The claim that the New Mexico Constitution was violated is not cognizable in a proceeding for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Richmond v. Embry*, 122 F.3d 866, 870 (10th Cir. 1997).  Although I have not found any United States Supreme Court precedent on point, I will assume that a defendant's Sixth Amendment right to a fair trial would be violated if two members of the jury were unable to participate meaningfully because they lacked a

sufficient understanding of English.  *See Brown v. Runnels*, No. C 03-5410, 2007 WL 295551, at

*16-17 (N.D. Cal. Jan. 30, 2007) (indicating, in a § 2254 proceeding, that a juror's inability to

understand English would violate Supreme Court precedent that due process requires a jury capable

of deciding the case on the evidence before it); *cf. United States v. Hall*, 989 F.2d 711, 714 (4th Cir.

1993) (holding that defendants are constitutionally entitled to a mentally competent jury (citing

*Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912))).  Nevertheless, there is nothing in the record

to suggest that Baca and Petalco had difficulty with English, and Tolliver provides no support for his

allegation that they could not read and understand the language well enough to participate.

Tolliver is also not entitled to habeas relief on his claim that the foreman coerced Baca and

Petalco into voting to convict.  The trial judge relied on NMRA 11-606(B) in denying the motion for

new trial on the ground that certain jurors felt forced into the verdict.  (Sentencing Tape 1 July 20,

2005.)  That rule is almost identical to Rule 606(b) of the Federal Rules of Evidence, which generally

prohibits consideration of a juror's statements to invalidate a verdict.  Statements "concerning

intimidation or harassment of one juror by another fall[] squarely within the core prohibition" of this

rule.  *United States v. Stansfield*, 101 F.3d 909, 914 (3d Cir. 1996) (internal quotation marks

omitted).  Given that jury deliberations are conducted in private, it is difficult to imagine how one

juror's coercion of other jurors could be established without consideration of the jurors' statements

themselves.  The Supreme Court has held that Rule 606(b) does not violate the Sixth Amendment.

*See Tanner v. United States*, 483 U.S. 107, 126-27 (1987);  *Robinson v. Polk*, 438 F.3d 350, 363

(4th Cir. 2006) ("*Tanner* thus establishes that the Sixth Amendment's guarantees do not require

judicial consideration of juror allegations regarding influences internal to the deliberation process.").

Accordingly, the state courts did not unreasonably apply clearly established federal law by rejecting

Tolliver's claims of juror misconduct.  *See Robinson v. Gibson*, 35 F. App'x 715, 719-21 (10th Cir. 2002) (unpublished) (refusing to consider jurors' statements that other jurors harassed, coerced, physically threatened, and racially intimidated the jury's only African American, who cast the sole vote against the death sentence, and collecting published cases reaching the same result in similar circumstances).

### SPEEDY TRIAL

Tolliver contends that his right to a speedy trial was violated.  Speedy trial claims are evaluated using the familiar four-factor balancing test of *Barker v. Wingo*, 407 U.S. 514, 530 (1972): 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of the right; and 4) prejudice to the defendant.

#### *Length of Delay*

Tolliver asserts that the length of delay in this case was two years.  The length of delay is measured from the earlier of the date of arrest or formal accusation.  *See United States v. Marion*, 404 U.S. 307, 320-21 (1971); *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006).  Tolliver was arrested on March 31, 2004 for the charges at issue in this case.[1]  (Trial Tape 5 June 27, 2005.) A criminal information containing the charges was filed on June 1, 2004, and trial commenced on June 27, 2005.  (RP at 1; Trial Tape 1 June 27, 2005.)  Therefore, the actual delay (from arrest to trial) was approximately fifteen months. This delay was sufficiently long to trigger consideration of all the *Barker* factors.  *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (stating that a delay approaching one year is presumptively prejudicial).

---

[1] He was arrested in January 2004 for other offenses.  (Doc. 9 Ex. I at 4-5.)  This arrest plays no part in the speedy-trial analysis.  *See Cowart v. Hargett*, 16 F.3d 642, 645-46 (5th Cir. 1994).

The presumption that delay prejudiced the defendant intensifies over time. *Id.* at 652. Less delay is tolerated for ordinary street crimes, and more for complex conspiracy charges. *Barker*, 407 U.S. at 531. Tolliver contends that the charges in this case were of "medium complexity." (Doc. 1 at 7.) Accepting that characterization, the length-of-delay factor weighs slightly in favor of Tolliver's speedy trial claim. *See United States v. Santiago-Becerril*, 130 F.3d 11, 22 (1st Cir. 1997) (characterizing charges for wrongful taking of a motor vehicle with force resulting in death and knowing use of a firearm in relation to a crime of violence as more complicated than an ordinary street crime but less so than complex conspiracy charges and holding that fifteen-month delay was arguably sufficient to "tip the scales slightly in favor" of the defendant's speedy trial claim).

### Reason for Delay

A deliberate attempt to hamper the defense by delaying trial should weigh heavily against the government. *Barker*, 407 U.S. at 531. Neutral reasons, such as negligence or overcrowded dockets, weigh less heavily against the government. *Id.* A valid reason, such as a missing witness, serves to justify appropriate delay. *Id.*

Tolliver claims that the reason for the delay was for the prosecutor to obtain fabricated evidence and cover up exculpatory evidence. There is nothing to support this allegation. Instead, the record reveals the following.

The case was set for trial on December 6, 2004. (RP at 19.) Defense counsel filed an unopposed motion for a continuance because she had a conflict on that date and needed additional time to prepare. (*Id.* at 101.) The motion was granted and trial was continued to April 4, 2005. (*Id.* at 103.) On March 9, 2005, a stipulated motion for continuance was filed by the prosecution. The motion stated that two prosecution witnesses had conflicts on April 4, that defense counsel needed

additional time to prepare pretrial motions, and that both sides were concerned that the current jury panel was not large enough. (*Id.* at 135.) This motion was granted, and trial was set for June 27, 2005. (*Id.* at 137, 161.)

On June 3, 2005, a pretrial conference was held and counsel announced that they were ready for trial on June 27. (Hearing Tape 2 June 3, 2005.) The court set Tolliver's motion to suppress for a hearing on June 13, 2005. (*Id.*) On that day, Tolliver's attorney advised the court that on June 3, Tolliver had informed her that he was aware of some individuals who could impeach the credibility of Beals, the confidential informant. (Hearing Tape 1 June 13, 2005.) According to Tolliver, he had the names and contact information for these individuals at the prison in Las Cruces. In an effort to facilitate communication between Tolliver and his attorney, the court had ordered that he remain in Socorro after the June 3 hearing. Therefore, Tolliver had been unable to provide his attorney with the potential witnesses' names and contact information. (*Id.*) Counsel stated that Tolliver had asked her to move for a continuance because there was not enough time to contact these witnesses before the trial setting. (*Id.*) The prosecutor opposed any further continuances, noting that Tolliver had known the name of the confidential informant for one year. She also claimed that Tolliver had engaged in delay tactics to postpone an earlier trial on other charges. (*Id.*) The court denied the continuance. (*Id.*) The prosecutor offered defense counsel a subpoena duces tecum to obtain the information from Las Cruces. (Hearing Tape 2 June 13, 2005.)

After the June 13 hearing, Tolliver sent a letter to the trial judge, requesting that his attorney be dismissed as ineffective. (RP at 214.) Specifically, he claimed that he had not heard from counsel in nine months and she had failed to provide him with discovery as promised. (*Id.* at 214-15.) He also complained that he had not been returned to Las Cruces to retrieve his paperwork, including his

witness list, nor had the paperwork been sent to him.  (*Id.* at 215-16.)  In response to the letter, defense counsel filed a motion to withdraw.  (*Id.* at 219.)

On June 23, 2005, the court conducted a hearing on the motion to withdraw.  The prosecutor again expressed her opinion that Tolliver was engaging in dilatory tactics.  (Hearing Tape June 23, 2005.)  Defense counsel initially stated out of Tolliver's presence that at the conclusion of the June 13 hearing, Tolliver gave her the names of some witnesses without contact information.  She attempted to locate the witnesses using the Internet and directory assistance, but had been unsuccessful.  She stated that Tolliver instructed her not to obtain his paperwork from Las Cruces because he did not want anyone else handling the material.  Later, after speaking with Tolliver, counsel advised the court that she had apparently been mistaken in believing that Tolliver did not want the paperwork sent to him.  The court denied the motion to withdraw, but again offered a subpoena duces tecum to obtain the paperwork.  (*Id.*)

From this review of the record, it is apparent that most, if not all, of the delay from the initial December 2004 trial setting to the commencement of trial on June 27, 2005, was attributable to the defense.  The first continuance was due to defense counsel's scheduling conflict and need for additional time to prepare.  The second continuance was due to the unavailability of prosecution witnesses, defense counsel's need for additional time, and the size of the jury pool.  It is doubtful that either of these continuances should be weighed against the prosecution. *See Barker*, 407 U.S. at 531 (stating that a missing witness serves to justify delay); *Batie*, 433 F.3d at 1291 (refusing to weigh a joint motion for continuance against the government).  At most, the concerns over the size of the jury pool may cause the second continuance to weigh slightly against the government.

*Assertion of the Right*

The Tenth Circuit has characterized this factor as "[p]erhaps [the] most important." *Batie*, 433 F.3d at 1291; *see also Barker*, 407 U.S. at 531-32 ("The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight . . . .   We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.").   Tolliver failed to assert his right to a speedy trial.   He contends that this failure was due to ineffective assistance of counsel.   From the procedural history I have just discussed, however, it appears that the right was not asserted because a speedy trial was not desired.   Therefore, this factor weighs against the speedy-trial claim.   *See Barker*, 407 U.S. at 536 ("[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial."); *Batie*, 433 F.3d at 1292 ("Mr. Batie's persistent requests for continuances, even when opposed, scarcely demonstrate a desire for a speedier process.").

*Prejudice*

Prejudice is determined in light of the evils the speedy trial right is intended to avoid— oppressive pretrial incarceration, anxiety and concern of the defendant, and the possibility that the defense will be impaired.   *Barker*, 407 U.S. at 532.   Of these three, the most important is impairment of the defense "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."   *Id.*

Immediately after his arrest on March 31, 2004, Tolliver was released on bond.   (RP at 46, 65; Hearing Tape 1 June 13, 2005.)   Although he was later imprisoned for the ten months leading up to his conviction for these offenses, that imprisonment was for unrelated charges.   (Sentencing Tape

1 July 20, 2005.)  Imprisonment on other charges does not constitute prejudice under *Barker*.  *See Cowart*, 16 F.3d at 647.

Tolliver does not assert that he suffered from anxiety and concern.  He does argue, however, that he was prejudiced by the delay because his incarceration prevented him from finding and presenting evidence of his innocence.  This prejudice resulted not from the delay, but from his incarceration on unrelated charges.  No witnesses testified for the defense, so there can be no claim related to impaired memories.  *See Batie*, 433 U.S. at 1292 ("Ordinarily, the failure of a government witness's memory benefits, rather than prejudices, a defendant's case." (citing *Barker*, 407 U.S. at 521)).  There is also no indication that defense witnesses died or disappeared.

### Conclusion

Balancing all of the factors, I cannot say that the state habeas court unreasonably applied *Barker*.  Delays were sought by the defense, no assertion of the right was made, and no prejudice is apparent.

### FABRICATED EVIDENCE

Tolliver claims that the prosecutor introduced false evidence concerning a "meth lab." (Doc. 1 at 9.)  He asserts that the police and the prosecutor knew that there was no connection between him and the meth lab.  He also asserts that there was no "evidentiary link" between him and the drugs introduced at trial.  (*Id.* Supp. at 5.)  Tolliver claims that both the meth lab and the drugs came from the evidence room of the Albuquerque Police Department.  According to Tolliver, this evidence was in the evidence room during a period in which an investigation "proved significant amounts of fraud occurred with the custody and control of the evidence." (*Id.*)  He asserts that the prosecutor and the

11

police did not follow their own procedures and that the Albuquerque Police Department acted beyond its jurisdiction.

A prosecutor's knowing use of false evidence deprives a defendant of due process and warrants a new trial if there is a reasonable likelihood that the false evidence affected the verdict. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Romano v. Gibson*, 239 F.3d 1156, 1175 (10th Cir. 2001).

No actual "meth lab" was admitted as evidence at trial.  Beals testified that on December 16, 2003, he, Tolliver, and Kimble retrieved two suitcases containing a hose, flasks, and chemicals from a river.  (Trial Tape 5 June 28, 2005.)  According to Beals, Tolliver and Kimble used these items to cook methamphetamine that evening.  (*Id.*)  Beals identified the suitcases and their contents in two photographs supplied by the prosecution.  (*Id.*)  During cross-examination, defense counsel brought out inconsistencies in how Beals had described the suitcases before trial and during trial.  (Trial Tape 7 June 28, 2005.)  The two photographs and others were later admitted as evidence during the testimony of a prosecution expert in meth labs.  (Trial Tape 1 June 29, 2005.)  The expert testified that the photographs depicted the components of a meth lab, which he seized from a dumpster.  He explained how the components could be used to produce methamphetamine and opined, based on stains in the hose, that this lab had been used for that purpose.  (*Id.*)  There is nothing in the record to indicate that the prosecution fabricated any of this evidence.

Even if the evidence was fabricated, there is not a reasonable likelihood that it affected the verdict.  Tolliver was not charged with possession of a meth lab in this case; it was simply one piece of evidence used by the prosecution to establish that he manufactured and distributed methamphetamine.  In addition to the meth lab evidence, the jurors heard Tolliver's confession that

12

he had cooked methamphetamine twice with Kimble and Beals.  They also heard Beals's testimony that he observed Tolliver cooking the drug, which testimony was corroborated to some extent by the digital recordings that were played for the jury.

Furthermore, the prosecution established an "evidentiary link" between Tolliver and the methamphetamine introduced at trial.  For starters, Tolliver admitted that the methamphetamine seized from his truck on March 31, 2004 belonged to him.  (Trial Tape 5 June 27, 2005; Trial Tape 1 June 28, 2005.)  Law enforcement personnel established the chain of custody for this methamphetamine.  (Trial Tape 5 June 27, 2005; Trial Tape 1 June 28, 2005; Trial Tape 2 June 29, 2005.)  Their testimony does not indicate that it was ever at the Albuquerque Police Department.  (*Id.*)  The methamphetamine that Tolliver transferred to Beals on December 16, 2003 was not introduced at trial.  Beals testified that he sold it to someone else.  (Trial Tape 5 June 28, 2005.)  The methamphetamine that Tolliver transferred to Beals on December 10, 2003 was held at the Albuquerque Police Department, but law enforcement officers established the chain of custody of this evidence.  (Trial Tape 2 June 28, 2005; Trial Tape 7 June 28, 2005.)  There is nothing in the record to indicate that the evidence was fabricated.  In any event, as noted above, Tolliver admitted to cooking methamphetamine and transferring it to Beals.

The state habeas court did not unreasonably apply federal law in rejecting Tolliver's claims regarding fabricated evidence.

### RIGHT TO TESTIFY

Tolliver claims that he was denied his right to testify.  He states that he instructed his attorney to call him as a witness, but his attorney would not allow him to testify.  He further asserts that "contrary to controlling NM case law, the judge did not ask [him] whether he sought to testify in his

13

defense." (Doc. 1 Supp. at 3.)  Tolliver claims that his testimony "would have provided facts about the false meth lab" and that he would have identified six witnesses who would have proven his "actual innocence." (*Id.*)

As explained above, federal habeas relief is not available for violations of state law. Therefore, no relief can be granted on Tolliver's contention that New Mexico precedent required the trial judge to inquire as to whether he wished to testify.[2]  I am not aware of any United States Supreme Court precedent requiring the judge to advise a defendant about his right to testify at trial. *See Harris v. Everett*, No. 99-8102, 2000 WL 504731, at *3 (10th Cir. April 27, 2000) (unpublished) (refusing to grant habeas relief for trial judge's failure to advise defendant of his right to testify).

Moreover, the record does not support Tolliver's claim that his attorney refused to let him testify.  Following the judge's denial of the defense's motion for directed verdict, defense counsel informed the court that she had advised Tolliver that the decision whether to testify was "up to him" and that he did not wish to testify.  (Trial Tape 2 June 29, 2005.)  Tolliver did not voice any disagreement with what his attorney said.

Even if counsel did somehow prevent him from testifying, Tolliver has not established that he was prejudiced.  He does not identify the "facts" regarding the "false meth lab," nor does he provide any indication as to how his testimony would have established his innocence. *See Cummings v. Sirmons*, 506 F.3d 1211, 1230 (10th Cir. 2007) (holding that there was no prejudice from counsel's alleged error in advising § 2254 applicant not to testify because the Tenth Circuit was "unable to

---

[2] This contention appears to be wrong in any event. *See State v. Duran*, 731 P.2d 374, 376 (N.M. Ct. App. 1986) ("We are unwilling to impose on trial courts the burden of inquiring, each and every time a criminal defendant fails to testify on his own behalf, whether the defendant is waiving the right to testify.").

14

conclude, in light of the strong evidence of . . . guilt . . . , that the jury could reasonably have found [the applicant's] assertions of innocence believable").

The state habeas court did not unreasonably apply federal law in rejecting Tolliver's claim that he was denied the right to testify.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Tolliver contends that his attorney was ineffective in several ways. To establish ineffective assistance of counsel, he must satisfy a two-part test. First, he must show that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Judicial scrutiny of counsel's performance is highly deferential; thus, Tolliver must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689. Second, Tolliver must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694.

Tolliver states that a "partial record" of his attorney's failures was made at a pretrial hearing. (Doc. 1 Supp. at 4.) I assume Tolliver is attempting to reassert the allegations made in his letter to the trial judge and at the hearing on the motion to withdraw. In the letter, Tolliver claimed that counsel failed to contact him for nine months and failed to provide him with discovery. (RP 214-15.) Assuming this is true, he fails to demonstrate any prejudice from these failures.

In his habeas application, Tolliver states that he provided counsel with a list of six exculpatory witnesses. It is not clear if these are the same witnesses discussed at the pretrial hearings. At the hearing on the motion to withdraw, counsel stated that she thought Tolliver had told her not to retrieve his witness list from Las Cruces, but that he had just advised her that she was wrong about

15

that.  For purposes of argument, I will assume that counsel was wrong in believing that Tolliver did not want her to have the witness list sent to him.

In his habeas application, Tolliver claims that one of the witnesses is the district attorney's daughter, that her voice can be heard on the recordings made by Beals, and that defense counsel failed to investigate the district attorney's effort to cover up his daughter's involvement.  Tolliver does not explain how this alleged cover-up exonerates him.

Tolliver's habeas application does not provide any indication as to what his witnesses would have testified.  Without some idea as to how the witnesses would have assisted the defense, I cannot find any prejudice resulting from their absence.[3]  At the pretrial hearings, defense counsel stated that Tolliver told her that his witnesses would attack Beals's credibility.  Assuming this is true, there is still no indication as to how the witnesses would have attacked Beals's credibility.  I also note that counsel effectively cross-examined Beals about his criminal background and his selling of the methamphetamine he received on December 16, 2003, as well as how he stood to gain from cooperating with the government, inconsistencies in his testimony, and his misstatements to the law enforcement officers with whom he was working.  (Trial Tape 5 June 28, 2005.)

---

[3] One of the witnesses, Laura Torres, spoke at the sentencing hearing.  She said that Kimble told her that the week before Tolliver's trial, he gave his attorney a statement taking full responsibility for the manufacturing charges against Tolliver.  Torres stated that she was supposed to be a witness for Tolliver, but defense counsel did not call her to testify.  If she had testified, she would have told the jury about Kimble's statement.  (Sentencing Tape 1 July 20, 2005.)  Assuming such testimony would have been admissible, there is not a reasonable probability that it would have changed the outcome of the trial.  The prosecutor noted that Kimble had pled guilty pursuant to a plea agreement to all of the charges leveled against Tolliver that occurred on December 10, 2003 and December 16, 2003.  This included conspiring with Tolliver to commit trafficking by manufacturing methamphetamine.  (*Id.*)  If Torres had testified, the prosecutor certainly would have pointed out that Kimble's statement was inconsistent with his guilty plea.  There is nothing to indicate that Kimble was willing to testify and take sole responsibility for the offenses.

Tolliver further asserts that his attorney failed to question any witnesses, failed to conduct any investigation, and failed to enforce a discovery order, leaving him without exculpatory evidence. There is nothing in the record to support these assertions. From listening to counsel's cross-examination of the prosecution's witnesses, it is obvious that she had conducted pretrial interviews of the witnesses and was familiar with the prosecution's evidence. (*E.g.*, Trial Tape 5 June 28, 2005.)

Tolliver also states that counsel failed to object to a sleeping juror and that she drafted pleadings for another case during his trial. I have reviewed the tapes of the trial, and they contain no indication that a juror was sleeping or that counsel was working on another case.

Finally, Tolliver recasts his other claims as ineffective assistance of counsel claims. Specifically, he complains that counsel failed to object to the two jurors who did not speak or read English, failed to file a motion to dismiss based on the denial of a speedy trial, failed to investigate any of the fabricated evidence, and failed to call him as a witness. None of these complaints has merit for the reasons I have already explained.

The state habeas court did not unreasonably apply *Strickland* in rejecting Tolliver's claims of ineffective assistance of counsel.

## RECOMMENDATION

For the reasons stated above, I recommend that Tolliver's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody be denied and that this cause be dismissed with prejudice.

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition.  If no objections are filed, no appellate review will be allowed.**

WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE